IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORP., as Receiver for RAVENSWOOD BANK, an Illinois banking corporation,<br><br>              Plaintiff,<br><br>   v.<br><br>EDWARD PARZYGNAT, ANNETTE PARZYGNAT, HEIDI WEITMANN COLEMAN, and HEIDI WEITMANN COLEMAN, P.C.,<br><br>              Defendants. | Case No. 10 C 7038<br><br>Judge Virginia M. Kendall |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Federal Deposition Insurance Corporation ("FDIC"), as receiver for Ravenswood Bank ("Bank"), filed a Second Amended Complaint against Defendants Edward and Annette Parzygnat ("the Parzygnats") and Heidi Weitmann Coleman ("Coleman"), both in her personal capacity and as the sole shareholder, officer, and director of Heidi Weitmann Coleman, P.C., alleging tort claims resulting from a scheme to defraud the Bank into extending a mortgage loan to an unqualified buyer. The FDIC asserts the following claims against Coleman: (1) conspiracy to commit fraud (Count II); (2) aiding and abetting fraud or acting in concert to commit fraud (Counts III-IV); and (3) tortious interference with a mortgage contract between Tomasz Grzeszczak ("Grzeszczak") and the Bank, or in the alternative, aiding and abetting or acting in concert with Grzeszczak to breach the contract (Counts V-VII). Coleman moves to strike Counts III, IV, VI, and VII as redundant. Coleman also moves to dismiss Counts II and V alleging conspiracy to commit fraud and tortious interference with contract. For the following reasons, the Court grants in part and denies in part Coleman's Motion to Strike and denies Coleman's Motion to Dismiss.

# BACKGROUND

The following facts are taken from the FDIC's Second Amended Complaint and are accepted as true. *See Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995).

## I. The Alleged Scheme

Plaintiff FDIC was appointed as receiver of Ravenswood Bank ("Bank") on August 6, 2010. (Second Am. Compl. ¶ 2.) The FDIC brings this action under 12 U.S.C. § 1811 to recover losses that the Bank sustained from an alleged conspiracy between the buyer and seller to misrepresent the nature of a real estate transaction to induce the Bank to issue a mortgage loan to the buyer. (*Id.* ¶ 1.)

The Parzygnats purchased the piece of property at the center of this real estate transaction ("Property") in March 1997. (*Id.* ¶ 15.) The Property was a two-story building, with two residential apartments on the second floor and a commercial unit on the first floor. (*Id.*) The Parzygnats lived on the Property and operated a business out of the commercial unit. (*Id.* ¶ 16.) In March 2004 the Parzygnats entered into a ten-year commercial lease with Irving Deli, an entity owned by Cezary Lapa ("Lapa"). (*Id.* ¶¶ 18, 19.) Under the lease, Lapa had first option to buy the Property. (*Id.* ¶ 19.)

Irving Deli and Lapa failed to make timely rent payments to the Parzygnats, who relied on the payments to pay off a mortgage loan for a different piece of property. (*Id.* ¶ 20.) To increase cash flow, in 2005 the Parzygnats decided to sell the Property. (*Id.*) Lapa tried to exercise his first option to buy but could not obtain financing. (*Id.* ¶ 21.) This did not deter him; he recruited Grzeszczak to act as a nominee buyer to purchase the Property on his behalf. (*Id.*) Grzeszczak, who neither intended to contribute funds to purchase the Property nor intended to buy the Property for

himself, agreed to act as Lapa's nominee buyer. (*Id.* ¶ 22.) On the buyers side of the transaction, Lapa and Grzeszczak recruited Jacob Fine ("Fine") to be their mortgage broker and Martin Ptasinski ("Ptasinski") to be their attorney. (*Id.* ¶¶ 23, 24.) The Parzygnats and their attorney, Coleman, comprised the sellers side of the deal. (*Id.* ¶¶ 6-7, 25.)

After negotiating, the buyers and sellers arrived at a purchase price of $525,000. (*Id.* ¶ 27.) The Parzygnats and Coleman terminated the deal in October 2005, after the closing had been extended multiple times, because Grzeszczak and Lapa were unable to obtain a mortgage loan commitment. (*Id.* ¶ 30.) This failure did not discourage the Parzygnats and Grzeszczak to try again to finalize the sale of the Property a few months later. (*Id.* ¶ 31.) In December 2005 the Parzygnats and Grzeszczak entered into a second contract for the purchase and sale of the same Property ("Sham Sale Contract"). (*Id.*) This time, though, the Parzygnats and Grzeszczak agreed on an increased purchase price of $625,000. (*Id.*) The Sham Sale Contract provided Grzeszczak with a $120,000 credit for making improvements to the Property; this $120,000 was also the exact amount of the incremental increase between the first failed purchase contract and the second Sham Sale Contract. (*Id.* ¶ 86.) The Sham Sale Contract also required Grzeszczak to deposit $10,000 in earnest money with Coleman and obtain a $500,000 mortgage loan. (*Id.* ¶ 31.)

In December 2005 Fine presented the Sham Sale Contract to the Bank and requested the mortgage loan for Grzeszczak. (*Id.* ¶ 42.) At this time Fine did not notify the Bank that Grzeszczak was Lapa's nominee buyer, Lapa was the true buyer in interest, and neither Grzeszczak nor Lapa deposited the $10,000 earnest money as required. (*Id.*) Fine also withheld from the Bank the provision that gave Grzeszczak a $120,000 credit toward the purchase price and the fact that the mortgage loan proceeds were the only source of funding for the sale. (*Id.*) Also, in response to the

3

Bank's request, Grzeszczak submitted false personal financial statements by overstating his assets and inflating by at least $3,300 a month the rental payments of the Property's tenants. (*Id.* ¶¶ 46, 47, 49.) The Bank relied on these false misrepresentations in approving a $483,750 loan ("Bank Loan"). (*Id.* ¶ 50.) The Bank approved the loan on the condition that it would have a first mortgage lien on the Property, and the Parzygnats, Grzeszczak, Lapa, Ptasinski, Fine, and Coleman all knew about this condition. (*Id.* ¶ 51.)

The $483,750 loan and the $120,000 "improvements" credit did not fully cover the purchase price of the Property; there was a $55,000 shortfall. (*Id.* 53.) On the morning of the closing, the Parzygnats agreed to Lapa and Grzeszczak's request for seller financing in the amount of $55,000 ("Grzeszczak Mortgage"). (*Id.* ¶ 54.) As a purchase money mortgage, the Grzeszczak Mortgage took priority over the Bank's mortgage, in violation of the Bank Loan agreement between Grzeszczak and the Bank. (*Id.* ¶¶ 54-56.) Coleman created the Grzeszczak Mortgage and never disclosed it to the Bank before the closing. (*Id.* ¶ 56.)

Coleman drafted the closing statement, which was sent to the closing agent. (*Id.* ¶ 57.) The draft misleadingly stated that the $120,000 credit was "funds advanced for restoration." (*Id.*) Coleman also mislabeled the purchase money mortgage as "funds advanced by the seller." (*Id.*)

At the closing on May 22, 2006, all parties were present except the Bank. (*Id.* ¶ 58.) An agent of the title company prepared, and Coleman approved, a final Closing Statement. (*Id.* ¶ 61.) The final Closing Statement incorporated the same misrepresentations in the draft that Coleman prepared: it noted the $120,000 buyer credit, but incorrectly labeled the $55,000 purchase money mortgage as "funds advanced to seller." (*Id.* ¶ 61.) Additionally, the Closing Statement did not provide for an earnest money deposit credit. (*Id.*) The Closing Statement also reflected that the

4

Bank Loan was the only source of payment for the transaction; the Parzygnats used the funds to satisfy their existing mortgage debt and received $92,958.10 in cash. (*Id.* ¶ 62.)

At closing, Coleman, the Parzygnats, and the buyers failed to provide the Bank with a copy of the Closing Statement. (*Id.* ¶ 66.) After the closing, Grzeszczak defaulted on his mortgage payments to the Bank and fled the country. (*Id.* ¶¶ 71-72.) The Bank then initiated foreclosure proceedings and obtained a deficiency judgment in the amount of $307,904.70. (*Id.*)

## II. Coleman's Role

The FDIC alleges that Coleman, as the seller's attorney, had an integral role in a broad conspiracy that began in 2005 when the Parzygnats decided to sell the Property and stretched through the final closing of the sale in May 2006. From the beginning, Coleman knew that Lapa, who leased the Property from the Parzygnats, had the true interest in buying the Property but lacked the creditworthiness and financial resources to qualify for a mortgage loan. (*Id.* ¶¶ 25, 40.) Lapa enlisted Grzeszczak, who had no intent to make any personal payments toward the Property, as a nominee buyer to purchase the Property on his behalf. (*Id.*)

Coleman knew that Lapa and Grzeszczak lacked the financial qualifications for the loan yet went ahead with the transaction anyway. The deal reached by the buyers and sellers to transfer the Property for $525,000 fell through in October 2005 because Grzeszczak and Lapa were unable to obtain a mortgage loan commitment. (*Id.* ¶ 30.) Despite this, Coleman, as the Parzygnats' attorney, participated with others to continue to pursue a deal for an even higher purchase price of $645,000. (*Id.* ¶¶ 40, 85.) A $120,000 "renovation credit" accounted for the increase in purchase price between the failed first contract and the second Sham Sale Contract. (*Id.* ¶ 86.) The increase in purchase price artificially inflated Grzeszczak's financial position by making it appear that he was making

5

a significant downpayment on the Property. (*Id.*) Also, because banks rarely extend full financing, the $120,000 amounted to a concealed discount from the $645,000 purchase price. (*Id.* ¶ 88.) This allowed Grzeszczak to obtain almost complete financing for the transaction because, as the parties' previous negotiations that settled at $525,000 reveal, the Property was actually valued well below $645,000. (*Id.*)

The Sham Sales Contract also required Grzeszczak to make a $10,000 earnest money deposit to show his commitment to finalizing the deal. (*Id.* ¶ 31.) Coleman never enforced this requirement, apparently because she recognized that Grzeszczak was a nominee buyer and did not have a true interest in the Property, even though doing so would have benefitted the Parzygnats. (*Id.* ¶¶ 32, 87.)

The Bank approved the $483,750 loan to Grzeszczak with the requirement that it would have a first mortgage lien on the Property. (*Id.* ¶ 51.) Coleman was aware of this condition and acted together with the buyers and sellers to subordinate the Bank's interest. For example, to bridge the gap between the $483,750 loan and the total purchase price, Coleman prepared the Grzeszczak Mortgage, where the Parzygnats agreed to extend $55,000 financing to him. (*Id.* ¶ 55.) Because this took the form of a purchase money mortgage, it had priority over the Bank's "first" mortgage lien. (*Id.* ¶¶ 56, 89.) Further, Irving Deli and Lapa, as the former tenants, had the first option to buy the Property. (*Id.* ¶ 19.) Coleman knew about this, and the fact that such a purchase option took priority over the Bank's mortgage, yet she did not assign or amend any of the existing leases so that they would become subordinate to the Bank's mortgage. (*Id.* ¶¶ 64, 90.) Finally, Coleman knew that the Property's mixed use as both a commercial and residential building was illegal. (*Id.* ¶ 40.)

Coleman's actions to close the transaction also furthered the scheme. She prepared the Closing Statement for the title company, which inaccurately characterized the $120,000 credit and

the purchase money mortgage to Grzeszczak as a kind of "cash exchange." (*Id.* ¶ 88.) Likewise, Coleman falsely certified to the title company that there were no other mortgage liens or purchase options on the Property. (*Id.* ¶ 91.)

Had the bank known about the true nature of the transaction, or the actual financial position of the buyer, it would not have extended the mortgage loan to Grzeszczak to purchase the Property. (*Id.* ¶¶ 40, 89-91.)

## STANDARD OF REVIEW

To state a claim upon which relief can be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Detailed factual allegations" are not required, but the plaintiff must allege facts that, when "accepted as true . . . 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). When there are well-pleaded factual allegations, the Court assumes their veracity and then determines if they plausibly give rise to an entitlement to relief. *Id.* at 1950.

## DISCUSSION

**I.     Motion to Strike Under Rule 12(f)**

The Court can strike from a pleading any "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Courts generally disfavor motions to strike because they can unnecessarily delay the progress of the case, but where such a motion would remove unessential clutter and clarify the issues in dispute, they serve to streamline the litigation. *Heller Financial, Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989). Coleman moves under Rule 12(f) to strike Counts III-IV and VI-VII of the Second Amended Complaint, which assert aiding and

7

abetting and concert of action claims for the underlying torts of fraud and tortious interference with contract. Coleman argues that aiding and abetting and concert of action are theories of liability, not standalone causes of action. That is, because they are avenues that the FDIC can pursue to establish liability on the torts of fraud and tortious interference of contract, it is unnecessary for them to be pled as separate claims.

The FDIC presents no factual or legal argument as to how the aiding and abetting and concert of action claims are not redundant. Instead, it relies solely on the law of the case doctrine to argue that, because prior to removal the Circuit Court of Cook County denied the Parzygnats's motion to dismiss on these same claims, Coleman is precluded from seeking review again in this Court.

Under the law of the case doctrine, decisions on legal issues made at one stage of a case are binding on future decisions made in the same litigation. *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1038 n.9 (7th Cir. 1998). "In the context of removal, once the case is in federal court, the state court orders issued prior to removal are not conclusive but remain binding until they are set aside." *Payne*, 161 F.3d at 1037; *see* 28 U.S.C. § 1450 (stating that all "orders and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court"). This doctrine serves to promote judicial efficiency and the rights of the parties, and the plain wording of § 1450 gives the district court discretion to modify state orders issued prior to removal. *Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County, etc.*, 415 U.S. 423, 436 (1974); *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995). There is a presumption in favor of the law of the case, but

8

the Court retains some flexibility to reexamine its own rulings or those of a coordinate court. *Avitia*, 49 F.3d at 1227.

On July 7, 2010, the Circuit Court of Cook County denied Coleman's motion to dismiss Counts IV-VIII of the First Amended Complaint. These are the same counts as those now asserted in Counts III, IV, VI, and VII of the Second Amended Complaint, which Coleman seeks to strike. The July 7 order, however, contains only a one sentence statement denying Coleman's motion to dismiss; the precise reasoning for the denial and the arguments the state court considered are missing. Given that the Court cannot meaningfully ascertain the underlying basis for the order, and the fact that Coleman asserts arguments in her brief that, if followed, could lead to an outcome different from that of the state court, the Court will evaluate the merits of the Motion to Strike. *See, e.g., Kornelik v. Mittal Steel USA, Inc.*, No. 07-CV-69, 2007 WL 1468693, at *3 (N.D. Ind. May 18, 2007) ("blanket denial" of motion to dismiss in state court justified deviation from law of the case doctrine); *Cima v. Wellpoint Healthcare Networks, Inc.*, No. 05-CV-4127, 2006 WL 1914107, at *4 (S.D. Ill. July 11, 2006) (due in part to lack of analysis in state court order, court made independent examination of an Illinois HIPAA claim).

Coleman previously filed with this Court a Motion for Order to Amend Complaint based on the July 7 order. In addition to the one sentence dismissing the motion to dismiss, the state court granted the Bank leave to amend Count III of the First Amended Complaint to "make a more specific statement of facts as to Coleman's knowledge and conduct." (R. 16.) Coleman relied on § 1450 to claim that the state court order remained binding after removal, and the FDIC (who had substituted for the Bank) had no choice but to comply with the order. The Court granted the motion and ordered the FDIC to amend the complaint. (R. 21.) This case history is not, as the FDIC

9

contends, inconsistent with the rejection of the law of the case for this Motion to Strike the aiding and abetting and concert of action claims. The state court's order for Count III specifically explained why amendment was necessary—inadequate allegations of knowledge and conduct—so this Court could enforce the ruling. The same cannot be said about the state court's unadorned statement denying the motion to dismiss for the aiding and abetting and concert of action counts.

Turning to the merits of Coleman's Motion to Strike, she argues that the aiding and abetting and concert of action claims are not independent causes of action but rather theories under which the FDIC could establish the underlying tort. As such, they are redundant and unnecessary. Because the FDIC relied exclusively on the law of the case doctrine, it presented no response argument on this issue. First, Coleman claims that Count III (aiding and abetting fraud) and Count IV (concert in action to commit fraud) needlessly clutter the Second Amended Complaint because they are theories that the FDIC could use to prove the underlying tort of fraud (Count I). Likewise, the theories of aiding and abetting (Count VI) and concert of action (Count VII), which the FDIC could pursue to establish the underlying tort of tortious interference with contract (Count V), are also immaterial.

Aiding and abetting is not a cognizable tort. *Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 623 (7th Cir. 2000). But there is a difference between "a separate tort of aiding and abetting, and aiding and abetting as a basis for imposing tort liability." *Id.* Aiding and abetting is not a separate tort because "one who aids and abets a fraud, in the sense of assisting the fraud and wanting it to succeed, is himself guilty of fraud." *Id.*; *Cenco Inc. v. Seidman v. Seidman*, 686 F.2d 449, 453 (7th Cir. 1982) ("The only utility of a separate tort of aiding and abetting in the commission of a tort would be to give plaintiffs' lawyers one more charge to fling at the jury in the

hope that if enough charges are made the jury may accept at least one."). In other words, an actor who aids and abets the commission of a tort is liable for the underlying tort; the tort is the cause of action and aiding and abetting is a theory that the FDIC could employ to prove that cause of action. *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006); *Refco*, 229 F.3d at 623-24. The same reasoning holds true for concert of action, which is also a theory of liability, not an independent cause of action. *See, e.g., O'Leary v. Kaupas*, No. 08 C 7246, 2010 WL 4177264, at *3 (N.D. Ill. Oct. 19, 2010) (Kocoras, J.) (acknowledging concert of action and aiding and abetting as theories to establish liability for tortious conduct).

Here, the FDIC's three counts against Coleman for tortious interference of contract include the underlying tort itself (Count V) and the theories of aiding and abetting (Count VI) and concert of action (Count VII). As discussed, Counts VI and VII are legal theories that the FDIC can pursue to establish liability against Coleman for the tortious interference with contract tort. As they are redundant, the Court strikes Counts VI and VII. The aiding and abetting fraud (Count III) and concert of action to commit fraud (Count IV) claims, though, are different. The only claim alleging the tort of fraud is Count I and the FDIC asserts that claim only against the Parzygnats, not Coleman. That is, there is no underlying fraud tort asserted against Coleman that would render Counts III and IV redundant. In fact, striking Counts III and IV would leave the FDIC without a fraud claim at all. Both of these counts will therefore remain.

In the alternative, Coleman contends that the claim for aiding and abetting fraud fails on the merits. Under Illinois law, the elements of aiding and abetting are: "(1) the party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the

11

assistance; and (3) the defendant must knowingly and substantially assist the principal violation."
*Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 767 (Ill. App. Ct. 2003) (quoting *Wolf v. Liberis*, 505 N.E.2d 1202, 1208 (1987)). Coleman takes issue with element (3) and argues that there are insufficient factual allegations to show that she had any involvement with the "principal violation" of the scheme, which she characterizes as procuring the Bank Loan using documents that falsified the buyer's financial condition, leading to the default. Such an argument, however, ignores the broader nature of the alleged scheme: it is not just the isolated event of procuring the Bank Loan that defines the scheme. Instead, it more broadly encompasses the intent of Coleman, along with others, to mislead the Bank about the true nature of the real estate transaction so it would extend financing to an otherwise unqualified buyer. Ample allegations establish Coleman's involvement in the following aspects of the overall scheme: (1) knowledge about Lapa's use of Grzeszczak as a nominee buyer; (2) the misleading $120,000 credit; (3) the purchase money mortgage that took priority over the Bank's lien; (4) not preparing assignments or amendments to existing leases to the Property; (5) misrepresentations at closing; and (6) false certification to the title company. (Second Am. Compl. ¶¶ 85-91.) The allegations in the Second Amended Complaint do not support Coleman's narrow reading of the scheme as solely confined to the buyer submitting false financial documents to obtain the Bank Loan. Nor do the allegations sustain the argument that Coleman had nothing to do with Grzeszczak's failure to pay. The Court therefore denies the Motion to Dismiss Count III.

The Court grants in part and denies in part Coleman's Motion to Strike. The Court strikes Counts VI and VII as redundant but keeps Counts III and IV.

## II.      Motion to Dismiss Under Rule 12(b)(6)

Coleman also moves under Rule 12(b)(6) to dismiss Counts II (conspiracy to commit fraud) and V (tortious interference with contract).

### A. Conspiracy (Count II)

Count II alleges that Coleman conspired with the other participants in the scheme to defraud the Bank. In Illinois, the elements of civil conspiracy are: "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004). Just as a generic fraud claim must satisfy Rule 9(b)'s elevated "particularity" pleading standard, so too must conspiracy claims that sound of fraud. *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507-508 (7th Cir. 2007). Here, Coleman only challenges the adequacy of the allegations bearing on element (1)—whether Coleman "affirmatively and actually" agreed to defraud the Bank. (R. 32, Mot. Dismiss at 8.) She does not, for example, contend that the allegations of the fraudulent scheme fall short of Rule 9(b)'s particularity requirement.

Coleman argues that although the Second Amended Complaint lays out in detail the workings of the scheme, there are no allegations showing that she "agreed" to participate. She never joined the conspiracy, Coleman claims, because nothing shows that she knew about the fraudulent activity that others performed to obtain the Bank Loan. As discussed, the Second Amended Complaint links Coleman to the conspiracy by claiming that: she knew all along that Grzeszczak and Lapa were financially ineligible for the loan, she failed to enforce the earnest money requirement, she was aware of the $120,000 credit that accounted for the increase in the purchase price in the second round of negotiations, she prepared the purchase money mortgage, she neglected

13

to assign or amend the leases before closing, and she made certain misrepresentations at closing.[1] (Second Am. Compl. ¶¶ 85-91.) First, Rule 9(b) allows the FDIC to "allege[] generally" "[m]alice, intent, knowledge, and other conditions of a person's mind." At this early stage, these collective allegations establish Coleman's knowledge. Discovery is the best vehicle for exposing the veracity of Coleman's argument that she lacked knowledge. Second, in a civil conspiracy, agreement can be inferred where the allegations "would permit a reasonable jury to conclude that a meeting of the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives." *Hernandez v. Joliet Police Dept.*, 197 F.3d 256, 263 (7th Cir. 1999). This is exactly what the Second Amended Complaint does. As pled, Coleman knew from the beginning that the real estate transaction was structured in a way to enable a financially ineligible buyer to consummate the transaction, and she acted in unison with others to conceal the nature of the transaction to the Bank. Coleman's Rule 12(b)(6) challenge to Count II therefore fails.

**B.    Tortious Interference With Contract (Count V)**

The Circuit Court of Cook County's July 7 order, which denied the motion to dismiss, included this claim. As discussed, given the circumstances of the July 7 order, the law of the case doctrine does not preclude this Court from evaluating the sufficiency of Count V.

Coleman disputes the adequacy of the allegations that the FDIC provides to support the tortious interference with contract claim. Under Illinois law, the essential elements for a tortious interference with contract claim are: "(1) the existence of a valid and enforceable contract between

---

[1] Coleman presents extrinsic evidence that someone else prepared the false closing statement. If true, this would be one fact that downplays Coleman's role in the scheme. At the motion to dismiss stage, however, the Court only tests the adequacy of the complaint, namely whether it puts the defendant on notice and plausibly states a claim for relief; the Court does not evaluate the merits of the claim. *Gibson v. City of Chicago*, 910 F.2d 1510, 1521 (7th Cir. 1990). Such a fact is better left for a motion for summary judgment, where the Court fully analyzes the legal claims in light of the admissible evidence obtained during discovery.

the plaintiff and another; (2) the defendant's awareness of the contract; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's conduct; and (5) damages." *Seip v. Rogers Raw Materials Fund, L.P.*, 948 N.E.2d 628, 638 (Ill. App. Ct. 2011). Once again, because this claim sounds in fraud, Rule 9(b)'s "particularity" standard applies. *Borsellino*, 477 F.3d at 507. Coleman offers four different reasons as to why this claim is deficient: (1) the allegations against Coleman do not relate to the breach of contract—Grzeszczak's failure to pay the note underlying the mortgage; (2) the allegations suggest that Coleman is liable for certain things she did not do, such as failing to prepare certain documents, but these allegations do not constitute an "intentional act" inducing breach; (3) Coleman's actions were justified; and (4) the tortious interference claim was not the proximate cause of the Bank's damages. (R. 32, Mot. Dismiss at 10.)

The Second Amended Complaint alleges that, to cover the shortfall of $55,000, on the morning of closing Coleman prepared the Grzeszczak Mortgage, which extended to Grzeszczak financing of $55,000; because it was a purchase money mortgage it took priority over the Bank's mortgage, in violation of the Bank Loan agreement between Grzeszczak and the Bank. (Second Am. Compl. ¶¶ 54-56; 89.) At closing, Coleman also allegedly never assigned or amended the leases on the Property to eliminate the tenant purchase option that would also take priority over the Bank's mortgage in the event of default. (*Id.* ¶ 90.) In essence, these allegations establish that a condition of the Bank Loan agreement was that the Bank would receive a first priority in the Property, and despite knowing about this contract term, Coleman acted with others to push the Bank's priority interest farther from the first position. Taken together, these allegations satisfy the elevated pleading requirements of Rule 9(b).

15

This leaves Coleman's specific arguments about the insufficiency of the claim. First, Grzeszczak breached the Bank Loan agreement, but Coleman, on behalf of the Przygnats, went forward with the real estate deal and helped conceal that Grzeszczak was a nominee buyer and financially unqualified for the loan. Taking the FDIC's allegations as true, Coleman is connected to the issuance and default of the loan. Second, by aiding in misrepresenting to the Bank the nature of the transaction, Coleman intentionally set in motion a sequence of events inevitably leading to Grzeszczak's default. This relates to the proximate cause issue too. Default is a foreseeable result where, as here, the buyers and sellers consummate a transaction that all parties knew involved a nominee buyer and whose collective actions overstated the buyer's financial status to the Bank. Coleman repeatedly maintains that she cannot be responsible for ensuring that Grzeszczak, who was not her client, complied with his obligations to the Bank. The allegations in the Second Amended Complaint, however, do not clearly draw lines separating the conduct of the buyers and sellers. Rather, as alleged, both the buyers and the sellers (Coleman) worked together as one unit to obtain financing and complete the real estate deal. Count V therefore states a valid claim.

## CONCLUSION AND ORDER

For these reasons, the Court grants in part and denies in part Coleman's Motion to Strike. The Court strikes Counts VI and VII as redundant. Moreover, the Court denies Coleman's Motion to Dismiss Counts II and V.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: August 23, 2011